# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO

```
----------------------------------------------------------------x
                                          :
In re                                     :  Chapter 11
                                          :
Franciscan Communities St. Mary           :  Case No. 11-19865
of the Woods, Inc.,¹                      :
                                          :  Judge Jessica E. Price Smith
                       Debtor.            :
                                          :
----------------------------------------------------------------x
```

## DEBTOR'S CONSOLIDATED REPLY TO OBJECTIONS TO MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR AN ORDER, PURSUANT TO SECTIONS 105(A), 349 AND 1112(B) OF THE BANKRUPTCY CODE, (I) APPROVING PROCEDURES FOR (A) THE DISTRIBUTION OF FUNDS TO CERTAIN SECURED AND ADMINISTRATIVE CLAIMANTS AND (B) THE DISMISSAL OF THE DEBTOR'S CHAPTER 11 CASE; AND (II) GRANTING CERTAIN RELATED RELIEF

The above-captioned debtor and debtor in possession (the "Debtor") hereby

submits this consolidated reply (this "Reply") to the (i) objection of the United States Trustee

(Docket No. 289) (the "UST Objection"), (ii) limited objection of the Official Committee of

Unsecured Creditors (Docket No. 295) (the "UCC Objection") and (iii) limited objection of

Wells Fargo Bank, National Association and Sovereign Bank (Docket No. 299) (the "Lender

Objection" and, collectively with the UST Objection and the UCC Objection, the "Objections")

to the Motion of Debtor and Debtor in Possession for an Order, Pursuant to Sections 105(a), 349

and 1112(b) of the Bankruptcy Code, (I) Approving Procedures for (A) the Distribution of Funds

to Certain Secured and Administrative Claimants and (B) the Dismissal of the Debtor's

---

[1]     The Debtor, Franciscan Communities St. Mary of the Woods, Inc. (Employer Tax Identification No. 51-0436466), is an Illinois not-for-profit corporation with a business address of 1055 West 175th Street, Homewood, Illinois 60430 and a principal place of business of 35755 Detroit Road, Avon, Ohio 44011.

CLI-1983908v9

Chapter 11 Case; and (II) Granting Certain Related Relief (Docket No. 270) (the "<u>Motion</u>").[2]  In support of this Reply, the Debtor respectfully represents as follows:

1.      As a preliminary matter, none of the Objections voice an opposition generally to resolving this case in the manner proposed in the Motion.  Rather, each of the Objections identifies particular concerns with certain specific provisions of the Motion.  As set forth below, the Debtor believes that it has addressed all but one of the concerns expressed by the objecting parties.  The objection raised by certain of the Prepetition Secured Lenders to the proposed budgets is addressed in more detail below.

## The UST Objection

2.      The thrust of the UST Objection filed by the United States Trustee (the "<u>UST</u>") relates to paragraph 16 of the Motion and the proposed form of Dismissal Order attached to the proposed form of Dismissal Procedures Order (Exhibit B to the Motion) as Exhibit 2.  In particular, the UST objects to the Motion on the grounds that the proposed form of Dismissal Order appears to grant the Debtor a discharge and provide releases to non-Debtor third parties.

3.      The Debtor understands the UST's concerns and has revised the proposed form of Dismissal Order accordingly.  Specifically, the Debtor has added language to the proposed form of Dismissal Order to clarify that the Dismissal Order shall not:  (a) be construed to discharge any of the Debtor's obligations pursuant to either section 1141 or section 727 of the Bankruptcy Code; or (b) act as a release of any prepetition or postpetition claim held by or against the Debtor, or held by or against any third party.

---

[2]      Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

4.     Attached hereto as <u>Exhibit A</u> is a blackline comparison of the proposed form of Dismissal Order that shows the changes made thereto by the Debtor in response to the UST Objection and the Lender Objection (discussed below).  The UST has indicated that the revisions to the Dismissal Order resolve the UST Objection.

## The UCC Objection

5.     The UCC Objection relates to paragraphs 12 and 15 of the Motion, which provide for the funding of an Administrative Claims Account that will contain an amount of funds estimated to be necessary to pay all accrued and incurred remaining administrative claims in the Debtor's bankruptcy case in accordance with the Budget.  The Official Committee of Unsecured Creditors (the "<u>UCC</u>") asserts that, as of the date that the UCC Objection was filed, the UCC had not received a final version of the Budget and objects to the Motion on a limited basis to the extent that the Budget is not sufficient to pay all administrative claims incurred by the Debtor in the ordinary course of business.

6.     The Debtor believes that the Budget, as submitted to the Court through the Declaration of Louis E. Robichaux IV in Support of Motion of Debtor and Debtor in Possession for an Order, Pursuant to Sections 105(a), 349 and 1112(b) of the Bankruptcy Code, (I) Approving Procedures for (A) the Distribution of Funds to Certain Secured and Administrative Claimants and (B) the Dismissal of the Debtor's Chapter 11 Case; and (II) Granting Certain Related Relief, which is filed contemporaneously herewith and is incorporated herein by reference (the "<u>Robichaux Declaration</u>"), provides for sufficient reserved funds to pay in full all accrued and incurred remaining administrative claims in the Debtor's bankruptcy case.

## The Lender Objection

7.      The Lender Objection, a limited objection filed by Wells Fargo Bank, National Association ("Wells Fargo") and Sovereign Bank ("Sovereign"), briefly describes Wells Fargo's and Sovereign's concerns with respect to the proposed forms of Dismissal Procedures Order and Dismissal Order.  Specifically, Wells Fargo and Sovereign have requested that the Dismissal Procedures Order and Dismissal Order:  (a) "more specifically identify the defined term 'Prepetition Secured Lenders'"; (b) clarify the disposition of monies payable to the Prepetition Secured Lenders thereunder; and (c) clarify the consultation rights of the Prepetition Secured Lenders with respect to monies that would be held in the Debtor's estate post-Dismissal. The Debtor has been in communication with counsel to Wells Fargo and Sovereign regarding these concerns and has revised the proposed forms of Dismissal Procedures Order and Dismissal Order to address those concerns.  In addition to the blackline of the Dismissal Order attached hereto as Exhibit A, attached hereto as Exhibit B is a blackline comparison of the proposed form of Dismissal Procedures Order that shows the changes made thereto by the Debtor in response to concerns of Wells Fargo and Sovereign.

8.      The Lender Objection also references the fact that the Debtor and the Prepetition Secured Lenders have not been able to reach an agreement with respect to the amounts that should be deposited into either the Professional Fees Account or the Post-Dismissal Account.  As set forth in paragraph 15(a)(ii) of the Motion, the Professional Fees Account will contain an amount of funds equal to the remaining amounts authorized to be paid to professionals retained in the Debtor's bankruptcy case under the Budget, as it may be modified. The Debtor has proposed that the Budget be modified to allow the Professional Fees Account be funded with an additional $300,000 beyond that which was provided for by the Budget originally, in order to pay professionals' fees incurred prior to the dismissal of the case.

9.      As set forth in paragraph 15(a)(iii) of the Motion, the Post-Dismissal Account will contain an amount of funds estimated and agreed to by the Debtor and the Prepetition Secured Lenders (or by the Court if such agreement cannot be reached) to be required to pay the costs of winding up and dissolving the Debtor after the dismissal of the bankruptcy case. The Debtor has proposed to deposit $200,000 into the Post-Dismissal Account for post-dismissal professional fees, as set forth on the wind-down budget attached to the Robichaux Declaration (the "Wind-Down Budget").

10.      Importantly, the Motion provides that any amounts in these accounts that are not used to satisfy actual claims or expenses will be remitted to the Prepetition Secured Lenders.

11.      For the reasons set forth below, the Debtor submits that the funding of the Professional Fees Account and Post-Dismissal Account in accordance with a modified Budget and the Wind-Down Budget, respectively, is reasonable and appropriate and should be approved by the Court.

12.      As a threshold matter, paragraph 8 of the Court's order authorizing the sale of the Assets to Orion (Docket No. 267) (the "Sale Order") provided that transfer of the Debtor's assets shall be "free and clear of all Claims relating to the Assets, the operation of the Assets prior to Closing, or the transfer of Assets, except for Assumed Liabilities, with all Claims to attach to the *net proceeds* of the Sale Transaction." (Sale Order ¶ 8 (emphasis added).) "Net proceeds" means the sale proceeds net of the costs associated with the sale of the business, which costs include running the Debtor's business until the Closing of the sale of the Assets and the professional fees incurred in reaching that result. See, e.g., Anderson v. Comm'r, 123 T.C. 219 (2004) (defining "net proceeds," in accordance with Black's Law Dictionary's definition, as

"[t]he amount received in a transaction minus the costs of the transaction (such as expenses and commissions)"); <u>Bergman Hotel v. Barrett</u>, No. S-10791, 2003 WL 22753030, *3 (Alaska Nov. 19, 2003) ("Net proceeds, by definition, are "[t]he amount received in a transaction minus the costs of the transaction (such as expenses and commissions).") (quoting Black's Law Dictionary 1222 (7th ed. 1999)).[3] The vast majority of the professional fees incurred in the last several months have related to the sale of the Debtor's Assets; thus, they are costs associated with the sale of the business to which the Prepetition Secured Lenders' liens do not attach. As such, the consent of the Prepetition Secured Lenders is not required in order for the Professional Fees Account to be funded the requested $300,000 beyond that which was provided for by the original Budget.

           13.      Even if the Prepetition Secured Lenders' liens attached to the *gross* sale proceeds of the sale of the Debtor's Assets (which they do not), the Court could order a nonconsensual use of cash collateral pursuant to section 363(c)(2)(B) of the Bankruptcy Code if the Prepetition Secured Lenders are adequately protected. <u>See</u> 11 U.S.C. § 363(c)(2)(B). Here, the Prepetition Secured Lenders are adequately protected because their liens will attach to, and they will receive, the net proceeds from the sale of their collateral. <u>See</u>, <u>e.g.</u>, <u>MacArthur Co. v. Johns-Manville Corp.</u>, 837 F.2d 89, 94 (2d Cir. 1988) ("when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition") (citing <u>Ray v. Norseworthy</u>, 90 U.S. 128, 134-35 (1874)); <u>In re Arena Media Networks, LLC</u>, No. 10-10667, 2010 WL 2881346, at *5 (Bankr. S.D.N.Y. Mar. 22, 2010) (order authorizing free and clear sale of debtor's assets finding that parties who objected to the sale were "adequately protected by having theirs [l]iens attach to

---

[3]      Copies of the unreported orders cited herein are attached hereto collectively as <u>Exhibit C</u> and are incorporated herein by reference.

the net proceeds of the transactions with the same validity, enforceability, priority, force and effect that they now have as against the [a]ssets"); see also S. Rep. No. 95-989 (1978), reprinted in U.S. Code Cong. & Admin. News, 1978, pp. 5787, 5842 (committee report on 11 U.S.C. § 363(f)) ("Most often, adequate protection in connection with a sale free and clear of other interests will be to have those interests attach to the proceeds of the sale."); In re Collins, 180 B.R. 447, 452 (Bankr. E.D. Va. 1995) ("[t]he commonly accepted method for adequate[ly] protecting a secured creditor when a sale is authorized under section 363(f) is to order liens to attach to the proceeds of the sale"). Thus, for this additional reason, the Professional Fees Account should be funded as suggested by the Debtor absent the consent of the Prepetition Secured Lenders.

14.     Moreover, as discussed in the Motion, the alternative to the dismissal of the Debtor's chapter 11 case is either a liquidating plan or a conversion to chapter 7. The lenders who are objecting did not wish the Debtor to pursue a liquidating plan because that would have entailed significant added expense for the Debtor to solicit only the Prepetition Secured Lenders. (See Motion ¶¶ 17-18.)

15.     Similarly, if this case were converted to chapter 7, the Prepetition Secured Lenders would fare worse than if the relief requested by the Debtor is granted. Pursuant to section 326(a) of the Bankruptcy Code, a court may allow reasonable compensation under section 330 of the Bankruptcy Code of a chapter 7 trustee for the trustee's services, not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3% of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but

including the holders of secured claims.  11 U.S.C. § 326(a).  In the Debtor's case, a chapter 7 trustee likely would be entitled to approximately $520,000 — significantly more than the Debtor's request for $300,000 for professionals' fees incurred during the case.

16.     Furthermore, a chapter 7 trustee likely would charge just as much, if not more, to wind-down the case than the $200,000 being proposed by the Debtor for deposit into the Post-Dismissal Account.  Any fees earned/charged by a chapter 7 trustee would be paid first out of the Prepetition Secured Lenders' cash, such that distributions to the Prepetition Secured Lenders would be less in chapter 7.  For these reasons, the Prepetition Secured Lenders would be significantly worse off in chapter 7 than they would be if the Wind-Down Budget were approved.

17.     Therefore, the most reasonable, cost-effective solution is the one set forth in the Motion.  That path was acceptable to the Prepetition Secured Lenders.  Now, however, they do not wish to have that path funded.  It is not reasonable to ask the management and professionals who must conclude this case to do so without compensation.  The alternatives actually would leave the Prepetition Secured Lenders in a worse position.  The Lender Objection, to the extent not resolved by the changes to the Dismissal Procedures Order and Dismissal Order, should be overruled.

## Conclusion

18.     As set forth above, the proposed form of Dismissal Order, as revised, is clear that the dismissal of the Debtor's chapter 11 case is not intended to discharge any of the Debtor's obligations or act as a release of any prepetition or postpetition claim held by or against the Debtor, or held by or against any third party.  In addition, the Debtor believes the Budget provides sufficient funding to satisfy in full all administrative and valid priority claims.  Lastly, the Debtor's proposal for the funding of the Professional Fees Account and the Post-Dismissal

Account in accordance with the Wind-Down Budget is reasonable, appropriate and more beneficial to the Prepetition Secured Lenders than either a liquidating plan or a conversion to chapter 7. For all these reasons, the Debtor submits that the Objections, to the extent not resolved by the revisions to the Dismissal Procedures Order and Dismissal Order, should be overruled, and the Motion should be granted.

Dated: May 17, 2012

Respectfully submitted,

 /s/Carl E. Black
Heather Lennox (OH 0059649)
Carl E. Black (OH 0069479)
Jennifer L. Seidman (OH 0085036)
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
E-mail: hlennox@jonesday.com
        ceblack@jonesday.com
        jlseidman@jonesday.com

ATTORNEYS FOR DEBTOR
AND DEBTOR IN POSSESSION

## EXHIBIT A

**Blackline Comparison of Proposed Form of Dismissal Order**

CLI-1983908v9

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO

-------------------------------------------------------------x
                                                             :
In re                                                        :    Chapter 11
                                                             :
Franciscan Communities St. Mary                              :    Case No. 11-19865
of the Woods, Inc.,[1]                                       :
                                                             :    Judge Jessica E. Price Smith
                              Debtor.                        :
                                                             :
-------------------------------------------------------------x

### ORDER DISMISSING THE DEBTOR'S CHAPTER 11 CASE

This matter coming before the Court on the Motion of Debtor and Debtor in

Possession for an Order, Pursuant to Sections 105(a), 349 and 1112(b) of the Bankruptcy Code,

---

[1]     The Debtor, Franciscan Communities St. Mary of the Woods, Inc. (Employer Tax Identification No. 51-0436466), is an Illinois not-for-profit corporation with a business address of 1055 West 175th Street, Homewood, Illinois 60430 and a principal place of business of 35755 Detroit Road, Avon, Ohio 44011.

(I) Approving Procedures for (A) The Distribution of Funds to Certain Secured and Administrative Claimants and (B) The Dismissal of the Debtor's Chapter 11 Case, and (II) Granting Certain Related Relief (the "Motion"),[2] filed by the debtor and debtor in possession in the above-captioned case (the "Debtor"); the Court having reviewed the Motion ~~and~~, the Notice of Final Report**, the objection of the United States Trustee to the Motion (Docket No. 289) (the "UST Objection"), the limited objection of the Official Committee of Unsecured Creditors to the Motion (Docket No. 295) (the "UCC Objection"), the limited objection of Wells Fargo Bank, National Association and Sovereign Bank (Docket No. 299) (the "Lender Objection") and the Debtor's reply in support of the Motion (Docket No. [____]),** and having considered the statements of counsel with respect to the Motion at a hearing before the Court (the "Hearing"); and the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iii) notice of the Motion was sufficient under the circumstances and (iv) the dismissal of the Debtor's bankruptcy case is in the best interest of the Debtor's estate and its creditors; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED as set forth herein.

**2.    The UST Objection is RESOLVED and the UCC Objection and the Lender Objection are OVERRULED.**

~~2~~**3**.    The Debtor's chapter 11 case is hereby dismissed pursuant to section 1112(b) of the Bankruptcy Code.  **Notwithstanding the dismissal of the Debtor's**

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

**bankruptcy case, nothing in this Order shall be construed to discharge any of the Debtor's obligations pursuant to either section 1141 or section 727 of the Bankruptcy Code.**

~~3~~**4**.        Notwithstanding section 349 of the Bankruptcy Code, all prior orders of the Court entered in the Debtor's bankruptcy case, including, but not limited to, the Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof (Docket No. 178), shall survive the dismissal of this bankruptcy case.

~~4~~**5**.        Neither the Debtor, its affiliates, parent or sponsor, the DIP Lender, the Creditors' Committee, the Prepetition Secured Lenders,[3] nor any of their present or former directors, officers, employees, members, attorneys, consultants, advisors or agents (acting in such capacity), shall have or incur any liability to any person for any act taken or omitted to be taken in connection with or related to (a) the formation, preparation, dissemination, implementation, confirmation or consummation of the Motion (other than an action in contravention of the Motion or the implementation of the Dismissal Procedures Order or this Dismissal Order), (b) any contract, instrument, release or agreement or document created or entered into, or any other act taken or omitted to be taken in connection with the Motion, the Dismissal Procedures Order or this Dismissal Order and (c) the terms of any other order entered by the Court in connection with the Debtor's bankruptcy case.  **Notwithstanding the foregoing, nothing in this Order shall act as a release of any prepetition or postpetition claim held by or against the Debtor, or held by or against any third party; provided, however, that this sentence shall not limit or impair any relief granted in any other order of this Court.**

~~5~~**6**.        The Debtor shall continue with its dissolution in accordance with applicable nonbankruptcy law.

---

[3]        **For clarification, the term Prepetition Secured Lenders means Sovereign Bank, Wells Fargo Bank National Association, and The Bank of New York Mellon.**

6~~6~~7.     The Debtor is authorized to withdraw funds from the Post-Dismissal
Account by all usual means, including, without limitation, checks, wire transfers, automated
transfers and other debits to pay any and all amounts in accordance with the terms of the Dismissal
Procedures Order.

7~~7~~8.     Amounts held in the Post-Dismissal Account shall not be subject to
attachment, garnishment, levy or seizure under any legal or equitable process or any other process
of law whatsoever except as expressly authorized by order of the Court.

8~~8~~9.     At the time of the dissolution of the Debtor in accordance with applicable
nonbankruptcy laws, and after the payment of all Dissolution Costs, amounts left in the
Post-Dismissal Account, if any, shall be distributed to the Prepetition Secured Lenders.

9~~9~~10.     The Court shall retain exclusive jurisdiction with respect to any matters,
claims, rights or disputes arising from or relating to the implementation of any order of this Court.

# # #

Submitted by:

/s/  Carl E. Black
Carl E. Black (OH 0069479)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
E-Mail:  ceblack@jonesday.com

ATTORNEY FOR THE DEBTOR
AND DEBTOR IN POSSESSION

| Summary Report: Litera Change-Pro ML IC 6.5.0.313 Document Comparison done on 5/17/2012 6:59:56 PM | |
|---|---|
| **Style Name:** JD Blackline | |
| **Original Filename:** | |
| **Original DMS:** iw://CLI/CLI/1982418/1 | |
| **Modified Filename:** | |
| **Modified DMS:** iw://CLI/CLI/1982418/5 | |
| **Changes:** | |
| **Add** | 17 |
| ~~Delete~~ | 11 |
| ~~Move From~~ | 0 |
| Move To | 0 |
| **Table Insert** | 0 |
| ~~Table Delete~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| **Total Changes:** | 28 |

**<u>EXHIBIT B</u>**

**Blackline Comparison of Proposed Form of Dismissal Procedures Order**

CLI-1983908v9

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**

```
---------------------------------------------------------------x
                                                               :
In re                                                          :     Chapter 11
                                                               :
Franciscan Communities St. Mary                                :     Case No. 11-19865
of the Woods, Inc.,[1]                                         :
                                                               :     Judge Jessica E. Price Smith
                        Debtor.                                :
                                                               :
---------------------------------------------------------------x
```

**ORDER, PURSUANT TO SECTIONS 105(A), 349 AND 1112(B)
OF THE BANKRUPTCY CODE, (I) APPROVING PROCEDURES
FOR (A) THE DISTRIBUTION OF FUNDS TO CERTAIN SECURED
AND ADMINISTRATIVE CLAIMANTS AND (B) THE DISMISSAL OF THE
DEBTOR'S CHAPTER 11 CASE; AND (II) GRANTING CERTAIN RELATED RELIEF**

---

[1]     The Debtor, Franciscan Communities St. Mary of the Woods, Inc. (Employer Tax Identification No. 51-0436466), is an Illinois not-for-profit corporation with a business address of 1055 West 175th Street, Homewood, Illinois 60430 and a principal place of business of 35755 Detroit Road, Avon, Ohio 44011.

This matter coming before the Court on the Motion of Debtor and Debtor in Possession for an Order, Pursuant to Sections 105(a), 349 and 1112(b) of the Bankruptcy Code, (I) Approving Procedures for (A) The Distribution of Funds to Certain Secured and Administrative Claimants and (B) The Dismissal of the Debtor's Chapter 11 Case, and (II) Granting Certain Related Relief (the "Motion"),[2] filed by the debtor and debtor in possession in the above-captioned case (the "Debtor"); the Court having reviewed the Motion**, the objection of the United States Trustee to the Motion (Docket No. 289) (the "UST Objection"), the limited objection of the Official Committee of Unsecured Creditors to the Motion (Docket No. 295) (the "UCC Objection"), the limited objection of Wells Fargo Bank, National Association and Sovereign Bank (Docket No. 299) (the "Lender Objection") and the Debtor's reply in support of the Motion (Docket No. [\_\_\_]),** and having considered the statements of counsel with respect to the Motion at a hearing before the Court (the "Hearing"); and the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iii) notice of the Motion was sufficient under the circumstances and (iv) the dismissal of the Debtor's bankruptcy case pursuant to the Dismissal Procedures is in the best interest of the Debtor's estate and its creditors; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED, in part, as set forth herein.

**2.    The UST Objection is RESOLVED and the UCC Objection and the Lender Objection are OVERRULED.**

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

2~~3~~.     On ~~the business day prior to~~**or before** the Closing, the Debtor will ~~fund the following segregated accounts~~**set aside sufficient funds** with, to the extent necessary, a draw under the terms of the DIP Credit Agreement **and/or the proceeds from the sale of the Debtor's assets received on the Closing, to fund the following segregated accounts no later than one business day after the Closing**:

    (a)    Bank of America Account No. 6869 (the "<u>Administrative Claims Account</u>"), which will contain an amount of funds estimated to be necessary to pay all accrued and incurred remaining administrative claims in the Debtor's bankruptcy case in accordance with the Budget, as it may be modified;

    (b)    Bank of America Account No. 7236 (the "<u>Professional Fees Account</u>"), which will contain an amount of funds equal to the remaining amounts authorized to be paid to professionals retained in the Debtor's bankruptcy case under the Budget, as it may be modified, less any amounts paid prior to the Closing; and

    (c)    Bank of America Account No. 6883 (the "<u>Post-Dismissal Account</u>"), which will contain an amount of funds estimated and agreed to by the Debtor and the Prepetition Secured Lenders (or by the Court if such agreement cannot be reached) to be required to pay the costs of winding up and dissolving the Debtor after the dismissal of this bankruptcy case (<u>e.g.</u>, fees for closing the books of the Debtor, filing federal and state tax returns, preparing W-2 forms, pursuing the dissolution of the Debtor under applicable state law and professional fees in connection with the foregoing) (collectively, without limitation, the "<u>Dissolution Costs</u>").

3~~4~~.     On **the Closing or as soon as reasonably practicable thereafter, but in no event later than one business day after** the Closing, the Debtor will then make the following cash payments:

    **(a)    first, the Debtor shall pay the amount of the transaction fee earned by Houlihan Lokey in connection with the sale of substantially all of the Debtor's assets to Orion pursuant to the terms of Houlihan Lokey's engagement letter agreement with the Debtor, dated November 12, 2011, in the amount approved by separate order of the Court;**

    (a**b**)    ~~first~~**second**, the Debtor shall pay the DIP Lender the amount necessary to fully satisfy all amounts due and owing under the terms of the DIP Credit Agreement (the "<u>DIP Lender Payment</u>"); and

(b~~c~~) ~~second~~**third**, the Debtor shall pay the remainder of its cash not ~~in~~**allocated to fund** the accounts described in Paragraph ~~2~~**3** above, to ~~the Prepetition Secured Lenders~~**Wells Fargo Bank National Association ("Wells Fargo") as Master Trustee for application in accordance with the terms of the Master Indenture and other documents associated with the Series 2004 Bonds,** in partial satisfaction of the Prepetition Secured Lenders' Bond Claim (the "Prepetition Secured Lenders Payment").

**5.** **As contemplated by the Order (I) Authorizing the Debtor to (A) Honor Claims Relating to Resident Entrance Fees and (B) Continue to Escrow Entrance Fees of New Residents and (II) Granting Related Relief (Docket No. 177) (the "Entrance Fee Escrow Order") and the terms of the Asset Purchase Agreement by and between Franciscan Communities St. Mary of the Woods, Inc. and Orion Properties Eleven LLC (the "APA"), in connection with the Closing, the Debtor shall instruct the escrow agent (the "Escrow Agent") for the Postpetition Escrow Account (as defined in the Entrance Fee Escrow Order ) to: (a) release to Orion the amount of Postpetition Entrance Fees (as defined in the Entrance Fee Escrow Order ) deposited in the Postpetition Escrow Account after the date of execution of the APA; and (b) release to Wells Fargo the remaining balance of Postpetition Entrance Fees held in the Postpetition Escrow Account.**

~~4~~**6**. Final fee applications from all professionals retained in the bankruptcy case setting forth all fees actually incurred during the Debtor's bankruptcy case through May 22, 2012 and estimated fees and expenses estimated to be incurred prior to the entry of the Dismissal Order shall be due no later than **May 31, 2012**.

~~5~~**7**. Objections, if any, to final fee applications must be filed and served on (a) counsel for the Debtor, Jones Day, 901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn: Heather Lennox, Esq. and Carl E. Black, Esq.); (b) counsel to the DIP Lender, Ungaretti & Harris LLP, Three First National Plaza, 70 West Madison, Suite 3500, Chicago, Illinois 60602 (Attn: John Durso, Esq. and George R. Mesires, Esq.); (c) counsel to Wells Fargo Bank, N.A.,

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111 (Attn: Daniel S. Bleck, Esq.); (d) counsel to Sovereign Bank, Duane Morris LLP, 190 South LaSalle Street, Suite 3700, Chicago, Illinois 60603 (Attn: John R. Weiss, Esq.); (e) counsel to the Bond Trustees (as defined in the Final DIP Order), Greenberg Traurig LLP, 2200 Ross Avenue, Suite 5200, Dallas, Texas 75201 (Attn: Clifton R. Jessup, Esq.); and (f) counsel to the Creditors' Committee, McDonald Hopkins LLC, 600 Superior Avenue, East, Suite 2100, Cleveland, Ohio 44114 (Attn: Scott N. Opincar, Esq. and Sean D. Malloy, Esq.) no later than **June 14, 2012**.

6**8**.      A hearing shall be held on all final fee applications filed by the Professional Fee Application Deadline on **June 26, 2012**.

7**9**.      Within three business days of the entry of order(s) approving the final fee applications of all professionals retained in the bankruptcy case, the Debtor shall make final payments to all such professionals for amounts due and owing in connection with the Debtor's bankruptcy case (the "Professionals' Payments") from the funds held in the Professional Fees Account.

8**10**.      Within three business days of the Professionals' Payments, any amounts remaining in the Professional Fees Account shall be paid to the Prepetition Secured Lenders.

9**11**.      The deadline for filing and serving on counsel to the Debtor a notice (an "Administrative Claim Notice") of an allegedly unpaid claim entitled to administrative priority treatment under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code (other than claims for (A) the payment of professional fees and reimbursement of expenses by professionals employed by the Debtor or the Creditors' Committee and (B) quarterly fees payable to the UST) ("Administrative Claims") shall be June 14, 2012 (the "Administrative Claims Bar Date"); provided, however, that any party in interest with an allegedly unpaid Administrative Claim

arising from liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date need not file an Administrative Claim Notice.

~~10~~**12**.   Within two business days of the entry of the Dismissal Procedures Order, the Debtor will file and serve a notice of the Administrative Claims Bar Date in substantially the form attached to the Motion as <u>Exhibit A</u> on all creditors who filed a proof of claim or that are scheduled in the Debtor's bankruptcy case.

~~11~~**13**.   Any party in interest with an allegedly unpaid Administrative Claim not listed on the Administrative Claims Schedule must file and serve on counsel to the Debtor a notice of such allegedly unpaid Administrative Claim by no later than the Administrative Claims Bar Date of **June 14, 2012**.

**14.**   **Any party in interest that fails to file and serve notice of an allegedly unpaid Administrative Claim by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting any Administrative Claim against the Debtor's estate.**

~~12~~**15**.   The Debtor shall have the right, in **consultation with and subject to the prior consent of the Prepetition Secured Lenders for any Administrative Claims asserted in an amount exceeding $25,000 (but with respect to Administrative Claims in amounts of $25,000 or less, in** its sole discretion**)**, to resolve all Administrative Claims filed and asserted against the Debtor, including, but not limited to, the right to file objections to Administrative Claims or enter into settlements with the holders of Administrative Claims.  Any objections to Administrative Claims must be filed and served no later than **June 28, 2012**.

~~13~~**16**.   A hearing shall be held to resolve any disputed Administrative Claims on **July 10, 2012**.

14**17**.   At the same time the Debtor makes the Professionals' Payments, the Debtor shall pay any remaining incurred and accrued Administrative Claims to which the Debtor has not objected and that have not already been paid in the ordinary course of business from the funds held in the Administrative Claims Account.

15**18**.   Within three business days of the execution a settlement agreement resolving a disputed Administrative Claim or the entry of an order by the Court allowing a disputed Administrative Claim, the Debtor shall pay such Administrative Claim from the Administrative Claims Account.

16**19**.   Within three business days after all Administrative Claims filed by the Administrative Claims Bar Date have been disallowed by the Court or paid by the Debtor (all payments on account of undisputed or allowed Administrative Claims, the "Administrative Claims Payments" and, together with the Professionals' Payments, the "Final Payments"), any amounts remaining in the Administrative Claims Account shall be paid to the Prepetition Secured Lenders.

17**20**.   After making the Final Payments, the Debtor will file with the Court a notice of final report (the "Notice of Final Report") substantially in the form attached hereto as Exhibit 1 setting forth the final amounts of the Professionals' Payments, the Administrative Claims Payments and the amount of any remaining funds in the Professional Fees Account and/or the Administrative Claims Account paid to the Prepetition Secured Lenders, along with a proposed form of order dismissing the Debtor's bankruptcy case (the "Dismissal Order") substantially in the form attached hereto as Exhibit 2.

18**21**.   The Debtor shall serve a copy of the Notice of Final Report via first class mail on (a) the United States Trustee for the Northern District of Ohio; (b) counsel for Wells Fargo Bank, N.A.; (c) counsel for the Bank of New York Mellon Trust Company, N.A.; (d) the Toledo-Lucas County Port Authority; (e) Sovereign Bank; (f) counsel for the DIP Lender; and

(f) those persons who have formally appeared and requested service in this proceeding pursuant to Bankruptcy Rule 2002.

~~19~~**22**.  The Court shall enter the Dismissal Order in substantially the form attached to the Dismissal Procedures Order as Exhibit 2 within seven days of the filing of the Notice of Final Report.

~~20~~**23**.  After entry of the Dismissal Order, the Debtor shall continue to dissolve in accordance with applicable nonbankruptcy laws.

~~21~~**24**.  At the time of the dissolution of the Debtor in accordance with applicable nonbankruptcy laws, and after the payment of all Dissolution Costs, amounts left in the Post-Dismissal Account, if any, shall be distributed to the Prepetition Secured Lenders.

**25.     All of the Debtor's financial institutions (including the Escrow Agent) are hereby authorized and directed to process, honor and pay all checks and electronic payment requests related to the transfers and payments authorized pursuant to the terms of this Order.**

# # #

Submitted by:

/s/ Carl E. Black
Carl E. Black (OH 0069479)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
E-Mail:  ceblack@jonesday.com

ATTORNEY FOR THE DEBTOR
AND DEBTOR IN POSSESSION

# **EXHIBIT 1**

Form of Notice of Final Report

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**

```
-------------------------------------------------------------X
                                                             :
In re                                                        :    Chapter 11
                                                             :
Franciscan Communities St. Mary                              :    Case No. 11-19865
of the Woods, Inc.,¹                                         :
                                                             :    Judge Jessica E. Price Smith
                                   Debtor.                   :
                                                             :
-------------------------------------------------------------x
```

**NOTICE OF FINAL REPORT AND FORM OF PROPOSED**
**ORDER DISMISSING THE DEBTOR'S BANKRUPTCY CASE**

PLEASE TAKE NOTICE THAT:

1.    On **[May] [__]**, 2012, the Court entered the Order, Pursuant to

Sections 105(a), 349 and 1112(b) of the Bankruptcy Code, (I) Approving Procedures for (A) The

Distribution of Funds to Certain Secured and Administrative Claimants and (B) The Dismissal of

the Debtor's Chapter 11 Case, and (II) Granting Certain Related Relief (Docket No. **[___]**)

(the "Dismissal Procedures Order").

2.    In accordance with the terms of the Dismissal Procedures Order, the final

fee applications of the following entities were filed by the Professional Fee Application Deadline:

(a)  **[Insert Names of Final Fee Applications]**

3.    On **[May] [__]**, 2012, the Court entered orders approving the payment of

professional fees to, and the Debtor paid such fees to:

(a)  Jones Day in the amount of $[_____];

---

¹       The Debtor, Franciscan Communities St. Mary of the Woods, Inc. (Employer Tax
        Identification No. 51-0436466), is an Illinois not-for-profit corporation with a business
        address of 1055 West 175th Street, Homewood, Illinois 60430 and a principal place of
        business of 35755 Detroit Road, Avon, Ohio 44011.

(b) Houlihan Lokey Capital, Inc. in the amount of $[_____];

(c) Deloitte Financial Advisory Services LLP in the amount of $[_____]; and

(d) McDonald Hopkins LLC in the amount of $[_____].

4.      In accordance with the terms of the Dismissal Procedures Order, after making the Professionals' Payments, the Debtor paid the remaining balance of $[_____] in the Professional Fees Account to the Prepetition Secured Lenders.

5.      In accordance with the terms of the Dismissal Procedures Order, the Debtor made Administrative Claims Payments totaling $[_____], and, after making the Administrative Claims Payments, the Debtor paid the remaining balance of $[_____] in the Administrative Claims Account to the Prepetition Secured Lenders.

6.      The Court may enter the Dismissal Order in the form attached hereto as Exhibit A within seven days of the filing of this Notice of Final Report.

Dated:  **[June] [__]**, 2012

Respectfully submitted,


/s/
Heather Lennox (OH 0059649)
Carl E. Black (OH 0069479)
George R. Howard (OH 0084147)
Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
E-mail:  hlennox@jonesday.com
           ceblack@jonesday.com
           grhoward@jonesday.com

ATTORNEYS FOR THE DEBTOR
AND DEBTOR IN POSSESSION

# EXHIBIT A

# **EXHIBIT 2**

Proposed Form of Dismissal Order

| Summary Report: Litera Change-Pro ML IC 6.5.0.313 Document Comparison done on 5/17/2012 6:56:10 PM | |
|---|---|
| **Style Name:** JD Blackline | |
| **Original Filename:** | |
| **Original DMS:** iw://CLI/CLI/1982400/1 | |
| **Modified Filename:** | |
| **Modified DMS:** iw://CLI/CLI/1982400/5 | |
| **Changes:** | |
| **Add** | 40 |
| ~~Delete~~ | 31 |
| ~~Move From~~ | 0 |
| Move To | 0 |
| **Table Insert** | 0 |
| ~~Table Delete~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| **Total Changes:** | 71 |

# EXHIBIT C

## Unreported Orders

CLI-1983908v9

Not Reported in B.R., 2010 WL 2881346 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2010 WL 2881346 (Bkrtcy.S.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States Bankruptcy Court,
S.D. New York.
In re ARENA MEDIA NETWORKS, LLC, Debtor.

No. 10–10667(BRL).
March 22, 2010.

Ian R. Winters, Joseph Corneau, Samir Gebrael, Klestadt & Winters, LLP, New York, NY, for Debtor.

***ORDER (A) APPROVING THE SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND REJECTION OF ALL NON–ASSUMED AND ASSIGNED UNEXPIRED LEASES AND EXECUTORY CONTRACTS, AND (C) GRANTING RELATED RELIEF PURSUANT TO BANKRUPTCY CODE § 105 AND GRANTING RELATED RELIEF***

BURTON R. LIFLAND, Bankruptcy Judge.

**\*1** Upon consideration of the motion dated February 8, 2010 (the "*Sale Motion* "), of Arena Media Networks, LLC (the "*Debtor* "), as debtor-in-possession, for an order (the "*Order* "), *inter alia,* pursuant to Sections 105, 363 and 365 of the United States Bankruptcy Code (the "Bankruptcy Code") and Bankruptcy Rules 6004, 6006, 7001 *et seq.* and 9014 authorizing and approving (a) the sale of certain assets relating to the Debtor's business (the "*Assets* ") described in and pursuant to the terms and conditions of an executed Asset Purchase Agreement, dated as of February 8, 2010 (the "*Asset Purchase Agreement* "), by and between the Debtor, as seller, and Access 360 Media, LLC, as buyer (the "*Purchaser* "), and (b) the assumption and assignment of various contracts identified in the Asset Purchase Agreement (the "*Designated Contracts* ") and rejection of all other contracts and leases not expressly

assumed and assigned hereunder; and a hearing on the Sale Motion having been held on March 22, 2010 (the "*Sale Hearing* "); and the Court having jurisdiction to consider and determine the Sale Motion in accordance with 28 U.S.C. § 157 and 1334; and due notice of the Sale Motion having been provided, and it appearing that no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor; the Court hereby finds and determines the following:

*General*

A. The Court has jurisdiction to consider the Sale Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334. The Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in the Court under 28 U.S.C. §§ 1408 and 1409.

B. The statutory predicates for the relief sought in the Sale Motion are sections 105(a), 363(b), (f), and (m), and 365(a), (b) and (1), of the Bankruptcy Code and Bankruptcy Rules 6004, 6006, 7001 *et seq.,* and 9014.

C. On February 18, 2010, the Court entered the Order Establishing Bidding Procedures and Related Relief Regarding Certain of the Debtor's Assets (the "*Bidding Procedures Order* ") establishing (a) Bid Procedures (as defined in the Sales Motion), including manner and form of notice to be applied during a sale of certain assets of the Debtor and assumption and assignment of related executory contracts, (b) date for auction ("*Auction* "), (c) date for hearing to consider approval of the Auction results (the "*Sale Hearing* ").

D. As evidenced by the affidavits and certificates of service filed with the Court, and based on the representations of counsel at the hearing, (i) proper, timely, adequate, and sufficient notice of the Sale Motion, the transactions contemplated therein (including the assumption and assignment of the Assumed Contracts (as defined below) and rejection of all other unexpired leases and executory contracts not expressly assumed and assigned hereunder), the Sale Procedures Order, the Bidding Procedures, the Auction and the Sale Hearing has been provided in accordance with Sections 102, 105, 363, and 365 of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2010 WL 2881346 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2010 WL 2881346 (Bkrtcy.S.D.N.Y.))**

Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 7001 *et seq.* and 9014; (ii) such notice was good and sufficient and appropriate under the particular circumstances; and (iii) no other or further notice of the Sale Motion, the transactions contemplated therein (including the assumption and assignment of the Assumed Contracts and rejection of all unexpired leases and executory contracts not expressly assumed and assigned hereunder), the Sale Procedures Order, the Bidding Procedures, the Auction, the Sale Hearing and the entry of this Order is required.

**\*2** E. A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including, but not limited to (i) The Office of the United States Trustee; (ii) the attorneys for the Purchaser; (iii) all non-Debtor counterparties to executory contracts and unexpired leases; (iv) all parties previously contacted in connection with the Debtor's marketing and sale efforts; (v) all known persons holding a lien on any of the Assets; (vi) all taxing authorities that have jurisdiction over the Assets; (vii) all of the Debtor's creditors; and (viii) all entities who have filed a notice of appearance and request for service of papers in the Debtor's bankruptcy case pursuant to Bankruptcy Rule 2002. The Debtor has filed with the Court affidavits and certificates of service of the Sale Motion, the Bidding Procedures Order, the Cure Notices [FN1], and related documents, detailing the manner of service thereof, and the persons served with, the Sale Motion, the Bidding Procedures Order, the Cure Notices and related documents.

> FN1. Capitalized terms not defined herein shall have the meaning ascribed to them in the Sale Motion.

### The Bankruptcy Case

F. On February 8, 2010 (the "*Petition Date* "), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. The Debtor continues to operate its business and manage its properties and assets as a debtor in possession under Bankruptcy Code Sections 1107(a) and 1108.

### The Sale Process for the Assets

G. Prior to the Petition Date, the Debtor worked to diligently examine and evaluate the assets, properties and rights held by the Debtor's estate.

H. In or about December, 2008, the Debtor entered into a brokerage agreement with Petsky Prunier ("*Petsky* "), an investment banking firm that specializes in marketing, information and digital media companies. Petsky served as Debtor's exclusive broker with the objective of finding a buyer and/or investor for Arena.

I. From December 2008 through February 2009, Petsky reached out to approximately one hundred and five (105) potential investors or buyers—ranging from financial institutions to venture funds. As a result of those efforts, approximately twenty-five (25) parties requested additional information but only four requested a management presentation.

J. Independent of Petsky's efforts, Debtor's management began searching for an investor or buyer starting in July 2009. After speaking with approximately twenty-five to thirty (25–30) potential purchasers (separate from the parties identified by Petsky), Debtor's management was able to identify four additional potential purchasers. These four interested parties did extensive due diligence on Debtor from August 2009 to January 2010. Of the four interested parties that reviewed the company's due diligence information, only Purchaser made an offer.

K. On February 8, 2010, Debtor and Purchaser entered into the Asset Purchase Agreement, whereby the Purchaser would acquire certain of the Debtor's assets for the Purchase Price, comprised of the following: An amount equal to the sum of the outstanding principal amount of the DIP Financing on the date of the Closing, not to exceed $800,000, plus the Purchaser/Lender's interest, fees and expenses, an amount representing the Designated Cure Costs (as defined in the Asset Purchase Agreement), expected to be between $3.6 and $5.2 million in the aggregate, plus $100,000 for distribution to remaining creditors and a maximum of $50,000 (plus access to Purchaser's back office resources and administrative services) to wind up the estate.

**\*3** L. The Debtor provided all notices as required under the Bidding Procedures Order.

M. No Qualified Offer (as defined by the Bidding Procedures Order) was received by the Debtor, and therefore no Auction was held. The Purchaser has

Not Reported in B.R., 2010 WL 2881346 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2010 WL 2881346 (Bkrtcy.S.D.N.Y.))**

therefore submitted the highest and best offer for the Assets on terms and conditions set forth in the Asset Purchase Agreement.

N. The Bidding Procedures afforded a full, fair and reasonable opportunity for any entity to make a higher or better offer to purchase the Assets and no higher or better offer has been made than that of the Purchaser.

O. The Debtor and the Purchaser have complied with the Bidding Procedures Order in all respects.

### The Sale of the Assets to the Purchaser

P. The transactions effectuating, and the terms and conditions governing, the sale of the Assets to the Purchaser are embodied in the Asset Purchase Agreement, which is attached hereto as *Exhibit A*. A description of the Assets is contained in Section 2.1 of the Asset Purchase Agreement. Moreover, a list of the Assumed Contracts (which represents the executory contracts that the Purchaser is assuming subject to a Closing as provided below and in the Asset Purchase Agreement) and the terms of this Order is contained in *Exhibit B* hereto (collectively, the "*Assumed Contracts* "), for assumption and further assignment to the Purchaser under the terms of the Asset Purchase Agreement and this Order.

Q. The Asset Purchase Agreement contemplates that the sale of the Assets shall be free and clear of all liens, claims, interests, and other encumbrances within the meaning of Section 363(f) of the Bankruptcy Code, including, but not limited to any and all liens, mortgages, security interests, conditional sale or title retention agreements, pledges, judgments, demands, encumbrances, easements, restrictions or charges of any and all kinds or nature and any and all claims (as defined in Section 101(5) of the Bankruptcy Code), obligations, demands, options, rights, restrictions, and interests, whether imposed by agreement, understanding, law, equity, or otherwise (collectively, "*Liens* "), except as expressly permitted by the Asset Purchase Agreement.

R. The Purchaser's obligation to consummate the transactions contemplated in the Asset Purchase Agreement is subject to the specific conditions outlined in that contract, including the condition of Court approval. As of the date of entry of this Order, there has been no failure of any condition under the Asset

Purchase Agreement to the Purchaser's obligation to consummate the Sale, and the Purchaser has agreed to the terms of this Order.

S. The Asset Purchase Agreement was negotiated, proposed, and entered into by and between the Purchaser and the Debtor without collusion, in good faith, and from arm's length bargaining positions. Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the application of Bankruptcy Code Section 363(n) to the sale, including having the Asset Purchase Agreement voided.

**\*4** T. The Purchaser is a good faith purchaser in accordance with Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Absent a stay of the effectiveness of this Order, if any, the Purchaser will be acting in good faith within the meaning of Bankruptcy Code Section 363(m) in closing the transaction under the Asset Purchase Agreement, including the assumption and assignment of the Assumed Contracts, at any time after the expiration of any stay of this Order, whether pursuant to Bankruptcy Rule 6004(g) or otherwise.

U. The Assumed Contracts to be assumed and assigned to the Purchaser are valid and binding, in full force and effect, and enforceable in accordance with their terms, and are property of the Debtor's estate pursuant to Section 541(a) of the Bankruptcy Code.

V. The terms and conditions of the Asset Purchase Agreement and the Closing Deliveries to be made by the Purchaser under the Asset Purchase Agreement (i) are fair and reasonable; (ii) valid, binding and enforceable; (iii) constitute the highest and best offer for the Assets; (iv) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative; and (v) constitute reasonably equivalent value and fair consideration for the Assets.

W. The transactions contemplated by the Asset Purchase Agreement will, upon consummation thereof (the "*Closing* "), (i) be a legal, valid, and effective transfer of the Assets to the Purchaser with no further action required on the part of the Debtor or the Seller (as defined in the Asset Purchase Agreement) or their respective affiliates and (ii) vest the Purchaser with good title to the Assets free and clear of all Liens, except as expressly permitted by the Asset Purchase

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2010 WL 2881346 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2010 WL 2881346 (Bkrtcy.S.D.N.Y.))**

Agreement, within the meaning of Section 363(f)(1) of the Bankruptcy Code.

X. The Purchaser would not have entered into the Asset Purchase Agreement and will not consummate the transactions described in the Asset Purchase Agreement (thus adversely affecting the bankruptcy estate and its creditors) if the sale of the Assets and the assignment of the Assumed Contracts were not free and clear of all Liens, except as expressly permitted by the Asset Purchase Agreement.

Y. The relief sought in the Sale Motion, including approval of the Asset Purchase Agreement and consummation of the transactions contemplated thereof is in the best interests of the Debtor, its bankruptcy estate, creditors, and all parties in interest. The Sale must be approved and consummated promptly in order to preserve the viability of the Debtor's business as a going concern and to maximize the value of the Debtor' estate.

Z. Upon entry of this Order, the Debtor has all the corporate or organizational power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement.

AA. Except as otherwise provided in this Order, no consents or approvals, other than this Order and those expressly provided for in the Asset Purchase Agreement, are required for the Debtor to consummate the transactions contemplated by the Asset Purchase Agreement.

**\*5** BB. The Debtor has demonstrated good, sound and sufficient business purpose and justification, and it is a reasonable exercise of its business judgment, to (i) sell the Assets on the terms and conditions set forth in the Asset Purchase Agreement; (ii) assume and assign the Assumed Contracts to the Purchaser and reject all other unexpired leases and executory contracts not expressly assumed and assigned hereunder; and (iii) consummate all transactions contemplated by the Asset Purchase Agreement, and the sale, assumption and assignment of the Assets is in the best interests of the Debtor, its estate and its creditors.

CC. The provisions of Sections 363 and 365 of the Bankruptcy Code have been complied with and are applicable to the sale of the Assets.

DD. The Debtor may consummate the transactions and transfer the Assets free and clear of all Liens of any kind or nature whatsoever, except as expressly permitted by the Asset Purchase Agreement, because one or more of the standards set forth in Section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. All parties with Liens of any kind or nature whatsoever in the Assets, except as expressly permitted by the Asset Purchase Agreement, who did not object to the Sale Motion and the relief requested therein, or who withdrew their objections to the transactions, are deemed to have consented pursuant to Sections 363(f)(2) and 365 of the Bankruptcy Code. All parties with Liens of any kind or nature whatsoever in the Assets, except as expressly permitted by the Asset Purchase Agreement, who did object to the Sale Motion and the relief requested therein fall within one or more of the other subsections of Sections 363(f) and 365 of the Bankruptcy Code and are **adequately protected** by having their Liens attach to the **net proceeds** of the transactions with the same validity, enforceability, priority, force and effect that they now have as against the Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtor and all parties in interest with respect to such Liens.

EE. Except as otherwise provided in the Asset Purchase Agreement and this Order, consummation of the transactions will not subject the Purchaser to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtor, any affiliate of the Debtor, or any other person by reason of such transfers and assignments, including, without limitation, based on any theory of antitrust or successor or transferee liability. Should the Purchaser be subjected to any claim contrary to the provisions of this paragraph, and whether or not this Court shall retain jurisdiction as such time as to the enforcement hereof, this provision may be enforced by the Purchaser in any court having jurisdiction of the subject matter as to which this provision is relevant.

**\*6** FF. The Purchaser has agreed to pay the Cure Amounts (as defined and set forth below) and has (i) cured, or has provided adequate assurance of cure, of all defaults under the Assumed Contracts, if any, existing before the date of this Order, within the meaning

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2010 WL 2881346 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2010 WL 2881346 (Bkrtcy.S.D.N.Y.))**

of Section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default before the date of this Order under the Assumed Contracts, if any, within the meaning of Section 365(b)(1)(B) of the Bankruptcy Code, and the Purchaser has provided adequate assurance of its future performance of and under the Assumed Contracts, within the meaning of Section 365(b)(1)(C) of the Bankruptcy Code.

**ACCORDINGLY, THE COURT HEREBY ORDERS THAT:**

*General Provisions*

1. The findings of fact entered above and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any finding of fact shall later be determined to be a conclusion of law, it shall be so deemed, and to the extent that any conclusion of law shall later be determined to be a finding of fact, it shall be so deemed.

2. The Sale Motion is granted in its entirety on the terms and conditions set forth herein.

3. All parties in interest have had the opportunity to object to the relief requested in the Sale Motion and to the extent that objections to the Sale Motion or the relief requested therein have not been withdrawn, waived or settled, such objections and all reservations of right included therein, are overruled on the merits. The parties who did not object, or who withdrew their objections, to the Sale Motion, are deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code. This Order incorporates the terms and provisions upon which certain objections were resolved, and accordingly, all authorizations and approvals provided for herein of the Asset Purchase Agreement, or any provisions thereof, shall, without the necessity of repeating such limitation, be subject to the terms of this Order.

*Approval of the Purchase Agreement*

4. Except as provided for in, and subject to the terms of, this Order, the Asset Purchase Agreement and all of the terms and conditions contained therein are approved in their entirety and are binding upon the parties thereto. Upon entry of, and subject to the terms of, this Order, the Asset Purchase Agreement, to the extent (if any) not already enforceable by its terms, shall be fully enforceable by the parties thereto in accordance with and subject to its terms and conditions.

5. Subject to the terms of this Order, the sale of the Assets and the terms and conditions contemplated by the Asset Purchase Agreement, including, without limitation, the closing of the transactions contemplated by the Asset Purchase Agreement, are hereby approved pursuant to Sections 105(a), 363(b) and (f) of the Bankruptcy Code.

**\*7** 6. Subject to the terms of this Order, the Debtor and Purchaser are authorized and directed, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, to perform all of their obligations pursuant to the Asset Purchase Agreement and to execute such other documents and take such other actions as are reasonably necessary to effectuate the transactions contemplated by the Asset Purchase Agreement.

7. The sale of the Assets will vest the Purchaser with good title to the Assets and will be a legal, valid and effective transfer of the Assets free and clear of all Liens, except as expressly permitted by the Asset Purchase Agreement or provided by this Order.

*Transfer of the Assets to the Purchaser*

8. Except as expressly provided in the Asset Purchase Agreement and this Order, pursuant to Sections 105(a), 363(1), and 365 of the Bankruptcy Code, upon the Closing, the Assets shall be sold, transferred or otherwise conveyed to Purchaser free and clear of all Liens, with all such Liens to attach to the proceeds of sale of the Assets in the order of their priority, and with the same validity, priority, force and effect which they now have as against the Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtor and all parties in interest with respect to such Liens. Notwithstanding the foregoing and anything in the Asset Purchase Agreement to the contrary, the asset identified in the Debtor's Schedule of Assets and Liabilities (the "*Schedules*") as "Taxes paid on behalf of AMN Mgmt Holdings LLC" in the amount of $60,415 (the "*Affiliate Receivable*") shall be an Excluded Asset under the Asset Purchase Agreement and shall not be an Acquired Asset sold to the Purchaser by the Debtor.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2010 WL 2881346 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2010 WL 2881346 (Bkrtcy.S.D.N.Y.))**

9. Notwithstanding anything in the Asset Purchase Agreement to the contrary, the asset identified in the Debtor's Schedules as "Advance to Art Williams" in the amount of $87,500 (the "*Williams Receivable* ") shall be an Acquired Asset as defined by the Asset Purchase Agreement. As additional consideration for the inclusion of the Williams Receivable as an Acquired Asset, the Purchase Price (as defined in the Asset Purchase Agreement) shall be increased by the sum of $10,000, and further, Mr. Williams agrees not to assert any claim against the Debtor's estate, except for any claims that may arise from the Debtor's estate's efforts to collect the Affiliate Receivable from him.

10. Except with respect to its obligations as provided for in the Asset Purchase Agreement and this Order, all persons or entities holding Liens in, to or against the Assets shall be, and they hereby are, forever barred, estopped, and enjoined from asserting such Liens against Purchaser, its successors and assigns or such Assets.

***Assumption and Assignment of the Assumed Contracts and Rejection of Other Executory Contracts and Unexpired Leases***

11. Subject to and conditioned on the Closing of the transactions contemplated in the Asset Purchase Agreement, the Debtor is authorized pursuant to Section 365(a) of the Bankruptcy Code to assume and assign the Assumed Contracts identified on *Exhibit B* hereto (which shall hereinafter, and for the purposes of this Order, constitute the "*Assumed Contracts* "). Notwithstanding anything in this Order or in the Asset Purchase Agreement to the contrary, at any time prior to Closing, the Purchaser may determine, in consultation with the Debtor, that it will not seek assignment of one or more contracts identified on the list of Assumed Contracts, in which case, prior to the Closing, the Debtor shall file a "Notice of Additional Excluded Contracts" identifying any such contracts previously designated as an Assumed Contract (the "*Additional Excluded Contracts* ") and such Additional Excluded Contracts and shall be deemed rejected in accordance therewith and pursuant to section 365(a) of the Bankruptcy Code.

**\*8** 12. Subject to the terms of this Order, conditioned on the Closing of the transactions contemplated in the Asset Purchase Agreement, pursuant to Bank-

ruptcy Code Sections 105(a) and 365, the Debtor's assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms contained in the Asset Purchase Agreement, of the Assumed Contracts is approved, and the requirements of Bankruptcy Code Section 365(b)(1) with respect thereto are deemed satisfied.

13. Subject to the terms of this Order, all Assumed Contracts are in full force and effect and have not been terminated by operation of law, their own terms or otherwise.

14. Upon Closing pursuant to the Asset Purchase Agreement and this Order, the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser and the non-Debtor parties to such Assumed Contracts in accordance with their terms, notwithstanding any provision in the Assumed Contracts (including, without limitation, those described in Sections 365(b)(2) and (1) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to Section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further obligation or liability for any breach of the Assumed Contracts occurring after such assumption and assignment.

15. All monetary defaults or other cure (within the meaning of Bankruptcy Code Section 365), if any, under the Assumed Contracts arising or accruing before the date of this Order (without giving effect to any acceleration clause or any default provisions of the kind specified in Bankruptcy Code Section 365(b)(2)) as agreed to by the Debtor and the non-Debtor parties thereto shall be the responsibility of the Purchaser, and shall be paid or satisfied by the Purchaser in accordance with section 365(b)(2) of the Bankruptcy Code.

16. The "Cure Amounts" shall be the amounts set forth in (i) the relevant Cure Notice, (ii) any stipulation or agreement in writing entered into between the Debtor and the non-Debtor party to an Assumed Contract or (iii) any prior Order of this Court, as applicable, and shall be controlling notwithstanding anything to the contrary in any Assumed Contract or other document, and the non-Debtor party to each Assumed Contract shall be forever barred from asserting any other claim relating to the respective As-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2010 WL 2881346 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2010 WL 2881346 (Bkrtcy.S.D.N.Y.))**

sumed Contract arising prior to the Closing against the Debtor or the Purchaser.

17. The failure of the Debtor or the Purchaser to enforce any term or condition of any Assumed Contract shall not constitute a waiver of such term or condition or of the Debtor's or the Purchaser's rights to enforce every term and condition of the Assumed Contracts. All Assumed Contracts are assumed in full except as otherwise agreed between the Debtor, the Purchaser, and the counterparty to such Assumed Contract.

18. Notwithstanding anything herein or in the Asset Purchase Agreement to the contrary, the Debtor, the Purchaser and the non-Debtor party to an Assumed Contract may, without the necessity of a further application to, order of this Court, or notice to any other person, agree in writing to modify any terms and conditions of an Assumed Contract, provided that such modifications do not create or give rise to any claims against the Debtors or their estates, and in which event such contract, as modified, shall be deemed to be the Assumed Contract for the purposes of this Order and the Asset Purchase Agreement.

**\*9** 19. All of the Debtor's executory contracts and unexpired leases that are not Assumed Contracts are hereby deemed rejected as of the Closing; except that the Debtor's non-residential real property lease with Brook L.L.C. shall not be deemed rejected as of the Closing.

20. The Washington Nationals Stadium, LLC (the "*Nationals* ") filed a limited objection with respect to the proposed assumption and assignment of its contract with the Debtor set forth on Exhibit B hereto and the Cure Notice with respect to the same (the "*Nationals Objection* "). Notwithstanding anything set forth in this Order or in the Asset Purchase Agreement, such contract shall not be an Assumed Contract, and nothing in this order shall be a determination of the Nationals' Objection as concerns such contract, including without limitation with respect to the Cure Amount, unless and until an agreement in writing is reached between the parties, or, in the absence of such agreement, a further hearing has been held with respect to the Nationals' Objection and a Bankruptcy Court order has been entered authorizing the assumption and assignment of such contract. Notwithstanding anything to the contrary set forth in this Order and in

the Asset Purchase Agreement, the agreement referred to in Schedule 2.1(d), item 59 of the Asset Purchase Agreement as being the unsigned agreement with the Nationals dated January 1, 2009, is neither a Designated Contract nor an Assumed Contract.

***Miscellaneous Provisions***
21. The consideration to be paid by the Purchaser for the Assets under the Asset Purchase Agreement is fair and reasonable and may not be avoided under Section 363(n) of the Bankruptcy Code.

22. This Order (a) is and shall be effective as a determination that, upon the Closing, except as expressly provided in the Asset Purchase Agreement, all Liens existing as to the Assets prior to the Closing have been unconditionally released, discharged and terminated in each case as to the Assets and (b) is and shall be binding upon and shall govern acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Purchaser is the assignee of the Assets free and clear of Liens. In addition, upon the Closing, each of the Debtor's creditors are authorized and directed to execute such documents and take all other actions to release its Liens in or on the Assets as may have been recorded or may otherwise exist.

23. Nothing in this Order shall be deemed to waive, release, extinguish, estop the Debtor or its estate from asserting or otherwise impair or diminish any right (including without limitation any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of an Excluded Asset (as defined in the Purchase Agreement).

**\*10** 24. Except as otherwise provided in the Asset Purchase Agreement and this Order, consummation of the transactions will not subject the Purchaser to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof, or hereafter arising, against the Debtor by reason of such transfers and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2010 WL 2881346 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2010 WL 2881346 (Bkrtcy.S.D.N.Y.))**

assignments, including, without limitation, based on any theory of successor or transferee liability.

25. Except with respect to enforcing the terms of the Asset Purchase Agreement and/or this Order, absent a stay pending appeal, no person shall take any action to prevent, enjoin or otherwise interfere with consummation of the transactions contemplated in or by the Purchase Agreement or this Order.

26. The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the Court; provided, however, that any such modification, amendment or supplement is neither material nor changes the economic substance of the transactions contemplated hereby.

27. In the absence of a stay of the effectiveness of this Order, in the event that the Purchaser and the Debtor consummate the transactions contemplated by the Asset Purchase Agreement at any time after entry of this Order, then with respect to the transactions approved and authorized herein, the Purchaser, as a purchaser in good faith within the meaning of Section 363(m) of the Bankruptcy Code, shall be entitled to the protections of Section 363(m) of the Bankruptcy Code in the event this Order or any authorization contained herein is reversed or modified on appeal.

28. The provisions of this Order are self-executing and each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

29. Until these cases are closed or dismissed, the Court shall retain exclusive jurisdiction (a) to enforce and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements, documents and instruments executed therewith; (b) to compel transfer of the Assets to the Purchaser; (c) to compel the Debtor and Purchaser to perform all of their respective obligations under the Asset Purchase Agreement, including the payment of the Purchase Price and transfer of the Assets; (d) to

resolve any disputes, controversies or claims arising out of or relating to the Asset Purchase Agreement, including without limitation the adjudication of any cure required under Assumed Contracts; and (e) to interpret, implement and enforce the provisions of this Order. Except as otherwise provided in the Asset Purchase Agreement and this Order, consummation of the transactions will not subject the Purchaser to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtor, any affiliate of the Debtor, or any other person by reason of such transfers and assignments, including, without limitation, based on any theory of antitrust or successor or transferee liability. Should the Purchaser be subjected to any claim contrary to the provisions of this paragraph, and whether or not this Court shall retain jurisdiction as such time as to the enforcement hereof, this provision may be enforced by the Purchaser in any court having jurisdiction of the subject matter as to which this provision is relevant.

**\*11** 30. Nothing in this Order or the Asset Purchase Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order.

31. The terms of this Order and the Asset Purchase Agreement shall be binding on and inure to the benefit of the Debtor, the Purchaser and the Debtor's creditors and all other parties in interest, and any successors of the Debtor, the Purchaser and the Debtor's creditors, including any trustee or examiner appointed in these cases or any subsequent or converted cases of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code.

32. The failure to include any particular provision of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of that provision, it being the intent of the Court and the parties that the Asset Purchase Agreement be authorized in its entirety.

33. Any conflict between the terms and provisions of this Order and the Asset Purchase Agreement shall be resolved in favor of this Order.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2010 WL 2881346 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2010 WL 2881346 (Bkrtcy.S.D.N.Y.))**

34. The Debtor is hereby authorized to perform each of its covenants and undertakings and to take such actions and expense such funds as may be necessary to effectuate the terms of this Order and as provided in the Asset Purchase Agreement prior to closing without further order of the Court.

35. As provided by Bankruptcy Rule 7062, this Order shall be effective and enforceable immediately. The provisions of Bankruptcy Rules 6004(g) and 6006(d) staying the effectiveness of this Order for 10 days are hereby waived, and this Order shall be effective, and the parties may consummate the transactions contemplated by the Asset Purchase Agreement immediately upon entry of this Order.

36. All parties hereto agree that the failure of a Closing to occur within fifteen (15) days of entry of this Order shall constitute an additional Event of Default under the DIP Loan and Security Agreement.

37. Notwithstanding any provision to the contrary in the DIP Loan and Security Agreement, the Interim Order or the Final Order, the Purchaser shall not be obligated to provide written notice of default if the Closing fails to occur within fifteen (15) days of entry of this Order. Unless such Event of Default shall be expressly waived, in writing, by the Purchaser, the Purchaser's obligations under the Final Order and the DIP Loan and Security Agreement shall immediately terminate without further notice and Purchaser shall be entitled to full enforcement of its rights as provided in the Final Order.

Bkrtcy.S.D.N.Y.,2010.
In re Arena Media Networks, LLC
Not Reported in B.R., 2010 WL 2881346 (Bkrtcy.S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in P.3d, 2003 WL 22753030 (Alaska)
**(Cite as: 2003 WL 22753030 (Alaska))**

**C**
Only the Westlaw citation is currently available.

NOTICE: UNPUBLISHED OPINION

Supreme Court of Alaska.
The BERGMAN HOTEL & The Estate of Marguerite
Scott, Appellants,
v.
Patrick BARRETT, Appellee.

No. S-10791.
Nov. 19, 2003.

**Background:** Hotel and decedent's estate appealed
order and judgment of the Superior Court, First Judi-
cial District, Juneau, Michael A. Thompson, J., ending
litigation between parties, and determining that de-
cedent's former husband was a de facto partner in
decedent's hotel and thus entitled to one-half of net
proceeds from sale of hotel.

**Holding:** The Supreme Court held that determination
that former husband was entitled to one-half proceeds
from sale of decedent's hotel was premature.
Reversed in part, vacated in part, and remanded.

West Headnotes

**Partnership 289 ☞302**

289 Partnership
    289VII Dissolution, Settlement, and Accounting
        289VII(C) Distribution and Settlement Be-
tween Partners and Their Representatives
            289k302 k. Discharge of Obligations. Most
Cited Cases

    Determination that decedent's former husband
was a de facto partner in decedent's hotel and thus
entitled to one-half of net proceeds from sale of hotel
was premature, as former husband's partnership in-
terest entitled him to a share of assets only after part-
nership's debts had been discharged. AS 32.05.350(2,
3).

Appeal from the Superior Court of the State of Alaska,
First Judicial District, Juneau, Michael A. Thompson,
Judge.Patrick W. Conheady, Juneau, for Appellants.

Thomas W. Findley, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS,
EASTAUGH, FABE, and CARPENETI, Justices.

*MEMORANDUM OPINION AND JUDGMENT* [FN*]

    [FN*] Entered pursuant to Appellate Rule 214.

**I. INTRODUCTION**
    **\*1** The Bergman Hotel and the Estate of Mar-
guerite Scott appeal a superior court order that ter-
minated the probate litigation between the Estate and
Patrick Barrett. Because Barrett's partnership interest
entitles him to a share of the assets only after the
partnership's debts have been discharged, we conclude
that the order and judgment in favor of Barrett were
premature. We reverse the order, vacate the judgment,
and remand the case to the superior court for further
proceedings.

**II. FACTS AND PROCEEDINGS**
    Patrick Barrett and Marguerite Scott married in
1978. In 1986 the couple dissolved their marriage. The
property settlement agreement called for Scott to
become the sole owner of the Bergman Hotel, located
in downtown Juneau, and expressly provided that
"[Barrett] can have residence at [the hotel] at any-
time." Barrett continued to live and work at the hotel
after the dissolution. Barrett's work entailed man-
agement and building maintenance.

    Scott died on August 5, 2000. Scott executed her
last will on March 17, 1999. The will bequeathed
one-half of Scott's estate to her daughter, and
one-eighth each of her estate to her granddaughter, her
two nieces, and Barrett. A previous will, executed in
1988, had called for Barrett to receive a half-interest in
the hotel upon Scott's death.

    Patrick Conheady, attorney for the Estate in this
appeal, filed an application for informal probate of
will and appointment of a personal representative

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in P.3d, 2003 WL 22753030 (Alaska)
**(Cite as: 2003 WL 22753030 (Alaska))**

shortly after Scott's death in which he sought to be appointed personal representative of the estate. Conheady placed a notice to creditors in a Juneau newspaper requesting creditors of Scott to present their claims to Conheady. Barrett delivered a letter to Conheady presenting a claim against the estate. The letter asserted two possible bases for claim: first, that Barrett had a de facto partnership interest in the hotel; and second, that he was due compensation for the services he rendered to the hotel over the years. Barrett calculated that his services were compensable at the rate of $1,000 per week or $52,000 per year, amounting to a claim of $780,000. Conheady responded by disallowing the claims because: "a) any compensation claimed for work performed subsequent to the divorce of the parties was previously compensated by providing the claimant free room and board for the ensuing time; and b) any claim for an ownership interest in the hotel is barred by fraud and laches." Barrett filed a petition for allowance of his claims, and later filed an amended petition asserting that he would "rely on, among other things, an unjust enrichment theory of recovery."

On June 1, 2001, Barrett filed a wage lien against the Bergman and Scott's estate for unpaid wages in the amount of $810,027 covering the period of his alleged employment from January 1, 1985, until May 31, 1998. The same day Barrett filed a second wage lien in the amount of $310,548 for his labor from June 1, 1998, through May 31, 2001. Barrett then filed a suit to enforce these liens.

**\*2** The Estate answered this suit by asserting various defenses and making counterclaims seeking indemnification from Barrett for debts incurred by Barrett that had become liens on the hotel. The pleading also alleged slander of title. Barrett answered the counterclaims and filed a motion to consolidate Barrett's wage lien suit with the probate case.[FN1]

> [FN1.] Barrett also sought to consolidate the Estate's forcible entry and detainer action against Barrett, but the Estate asked that the action be dismissed as moot after the Estate sold the hotel.

Barrett removed his wage liens to allow the hotel to be sold. After some liens against the property were satisfied, approximately $147,000 remained in the estate.

The superior court heard all matters at a hearing on October 17-18, 2001. In its memorandum of decision signed on March 6, 2002, the court found that Barrett had successfully met the burden required of him to prevail on his partnership theory. The court cited Barrett's "credible testimony" that "was complemented by several witnesses, either disinterested or even naturally aligned against him." Additionally, the court noted Scott's 1988 will that purported to leave one-half of the hotel to Barrett. The court concluded that under the "circumstances it would be inequitable to permit the latest will to divest Mr. Barrett of his promised and earned due." The decision also commented that the law favored estoppel of the later will's attempt to undo the "partnership" created.

As a result of this conclusion, the court found that Barrett was entitled to one-half of the net proceeds from the hotel's sale: $73,500, and that Scott's final medical expenses were the responsibility of her estate. The court explicitly noted that its decision held that Barrett was in effect a co-owner of the hotel. At the end of its decision, the court noted that "although not fleshed out at the trial the gross sale proceeds of the hotel were apparently impacted substantially by liens or claims that might arguably have been the result of Mr. Barrett's personal and various business failures."

Subsequent to the superior court's decision, the Estate filed a motion to amend and supplement counterclaims under Civil Rule 13(e). The basis for the motion was the court's decision finding that Barrett was effectively a partner in the Bergman. The amended and supplemented counterclaims alleged that as a partner, Barrett "is responsible for one half of the debts and liabilities incurred for the operation and maintenance of the hotel which have not been paid and remain as claims against the Estate." Among the debts and liabilities cited were a debt to South Central Timber Development, Inc., dating from June 1994, debts of $15,000 and $30,000 each plus interest incurred in 1998 and 1999 for the purpose of paying hotel debts, and a $38,123 debt to a law firm for services rendered to Barrett and Scott in a case during which Barrett disclaimed an ownership interest in the hotel. Additionally, the Estate alleged that a $51,910.44 lien satisfied from the proceeds of the sale of the hotel stemmed from a judgment entered against Barrett "for a debt incurred solely and apart from the operation of the Bergman Hotel."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in P.3d, 2003 WL 22753030 (Alaska)
**(Cite as: 2003 WL 22753030 (Alaska))**

**\*3** In an order dated May 16, 2002, the superior court issued an order that declared an end to this litigation between Barrett and the Estate. However, the court also acknowledged a possible problem with its initial order due to remaining claims against the hotel and stated that "[t]he spirit of the Court's decision was to recognize Mr. Barrett's 50% share of the hotel's value, whatever that might eventually be." The order confusingly states that "Mr. Barrett nonetheless gets his 1/2 of Hotel net proceeds up front. Should there be extant third party liens against the hotel, and thus this sum, so be it." This appears to indicate that Barrett should receive his portion of the proceeds from the sale of the hotel after all third-party claims against the hotel have been satisfied, while the Estate must satisfy other expenses out of the remaining half of the proceeds. The order explicitly allows that remaining third-party liens "or any such hotel claims can be litigated on their merits."

The superior court reduced the order to a judgment of $86,011.44.

The Estate appeals the dismissal of the civil case and the court's order that effectively denied its motion to amend and supplement its counterclaims.

### III. DISCUSSION

**A. It Was Error To Issue a Judgment Before Hotel Expenses Were Paid.**

**1. Standard of review**

Whether a partnership exists is a question of fact.[FN2] Under Alaska civil procedures "[f]indings of fact shall not be set aside unless clearly erroneous."[FN3] This court applies an abuse of discretion standard to procedural decisions of a superior court.[FN4] We find clear error and abuse of discretion only when the entire record leaves us "with a definite and firm conviction ... that a mistake has been made."[FN5]

FN2. *Parker v. Northern Mixing Co.,* 756 P.2d 881, 888 n. 11 (Alaska 1988).

FN3. Alaska R. Civ. P. 52(a).

FN4. *Willova v. State, Dep't of Corrections,*

53 P.3d 1115, 1119 (Alaska 2002).

FN5. *Martens v. Metzgar,* 591 P.2d 541, 544 (Alaska 1979).

**2. The superior court's ruling**

The trial court determined after a hearing that Barrett was a de facto partner in the Bergman Hotel and thus entitled to one-half of the net proceeds from the sale of the hotel. We uphold this decision. Nevertheless, the trial court's subsequent statements in its order of May 16, 2002, and in its June 2002 judgment require clarification and reversal.

The order filed on May 16, 2002, stated that Barrett "gets his 1/2 of Hotel net proceeds up front." This is a contradiction in terms. **Net proceeds**, by **definition**, are "[t]he amount received in a transaction minus the costs of the transaction (such as expenses and commissions)."[FN6] Because net proceeds necessarily encompass expenses, they cannot be distributed "up front."

FN6. BLACK'S LAW DICTIONARY 1222 (7th ed.1999).

**3. Partnership law**

Once Barrett was legally found to be a partner with a one-half interest in the Bergman Hotel, his interest became subject to partnership law.[FN7] In this case, the partnership dissolved upon the death of Marguerite Scott.[FN8] Under the law, upon dissolution, "each partner ... may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners."[FN9] Additionally, the partnership's "assets shall be applied ... to the satisfaction of the liabilities."[FN10] The partnership's liabilities "rank in order of payment as follows: (A) those owing to creditors other than partners; (B) those owing to partners other than for capital and profits; (C) those owing to partners in respect of capital; [and] (D) those owing to partners in respect of profits."[FN11] In other words, Barrett is entitled to his share in the proceeds from the hotel's sale only after the proceeds have been applied to the hotel's debts.

FN7. AS 32.05.010-.11.990.

FN8. *See* AS 32.05.260(4).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in P.3d, 2003 WL 22753030 (Alaska)
**(Cite as: 2003 WL 22753030 (Alaska))**

FN9. AS 32.05.330(a).

FN10. AS 32.05.350(3).

FN11. AS 32.05.350(2).

**4. The judgment was premature.**
    **\*4** On June 10, 2002, the superior court issued a judgment in favor of Barrett in the amount of $86,011.44. This amount included a principal sum of $59,125, as well as an "Uncontested Amount Due" of $14,375. Together, these figures total $73,500, or half of the $147,000 remaining from the sale of the hotel after payment of some liens. However, in other pleadings filed with the court, the Estate alleged that some third-party claims against the hotel had yet to be paid.

    It was error to issue a judgment in favor of Barrett that did not take into account other hotel-related expenses. As described above, Barrett's share of the proceeds from the sale of the hotel cannot be determined or distributed until all hotel debts are satisfied. The Estate is entitled to pay all liens on the hotel and any other expenses from hotel operations before paying Barrett his half of the net proceeds from the sale of the hotel.[FN12]

        FN12. *See, e.g., Reynolds v. Sisco Group, Inc.,* 70 P.3d 388, 391 (Alaska 2003) (heirs take decedent's property subject to the rights of creditors existing at the time of death).

**IV. CONCLUSION**
    We REVERSE the order terminating the litigation between Barrett and the Estate. We VACATE the judgment in favor of Barrett. We REMAND the probate matter to the superior court for a final accounting of the net proceeds from the sale of the hotel.

Alaska,2003.
Bergman Hotel v. Barrett
Not Reported in P.3d, 2003 WL 22753030 (Alaska)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.